# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of FISERV, INC., | |
| Plaintiff, | Case No. |
| v. | |
| FRANK J. BISIGNANO, ROBERT W. HAU, MIKE LYONS, KENNETH F. BEST, HENRIQUE DE CASTRO, STEPHANIE COHEN, HARRY F. DISIMONE, LANCE FRITZ, AJEI GOPAL, WAFAA MAMILLI, DOYLE R. SIMONS, KEVIN M. WARREN, CHARLOTTE YARKONI, and HEIDI G. MILLER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FISERV, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Fiserv, Inc. ("Fiserv" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*: the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of class action complaints filed in the securities class actions captioned *In re Fiserv, Inc. Securities Litigation*, Case No. 1:25-cv-06094-JHR-VF

(S.D.N.Y. July 24, 2025) (the "S.D.N.Y. Securities Class Action") and *Cypanga Sicav SIF v. Fiserv, Inc.*, Case No. 2:25-cv-01716-JPS (E.D. Wis. Nov. 4, 2025) (the "E.D. Wis. Securities Class Action," and together with the S.D.N.Y. Securities Class Action, the "Securities Class Actions"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Fiserv; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Fiserv against the Individual Defendants, certain of Fiserv's officers and directors, seeking to remedy their violations of federal law and breaches of fiduciary duty that have occurred from at least July 24, 2024 to October 29, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Fiserv and its shareholders.

2. Fiserv is a global provider of financial technology services and solutions, including payment processing, digital banking, fraud and risk management, and core banking solutions. The Company's operations fall into two reportable business segments: Merchant Solutions and Financial Solutions.

3. In July 2019, Fiserv acquired First Data Corporation ("First Data") and its subsidiaries, including Clover Network, Inc. ("Clover"), a company that operated a cloud-based point-of-sale ("POS") and payment processing platform designed to help businesses accept payments, manage sales, and run their operations more efficiently. At the time, the Company touted the acquisition as an opportunity to strengthen its position in the payment industry and expand its merchant capabilities. Clover operates under the Company's Merchant Solutions business segment.

2

4.     Clover has since become the Company's flagship product, primarily generating revenue as a payment processing platform, collecting transaction fees from merchants as a percentage of the total transaction amount. Clover additionally generates revenue through POS hardware sales and subscription-based value-added services ("VAS"), including payroll administration software, merchant financing, and cash flow management solutions. In addition to revenue, a key indicator of Clover's growth and performance is gross payment volume ("GPV"), a measure of the total monetary value of transactions processed through the Clover platform.

5.     In mid-2023, Fiserv began to phase out Payeezy, its previous payment processing platform for small businesses, and started forcibly migrating its Payeezy merchants at up to 200,000 locations to Clover. This back book conversion fueled significant growth to Clover's revenue and GPV in the first half of 2024.

6.     However, the migration to Clover represented a significant cost increase for merchants. While Payeezy was a relatively affordable platform, providing only basic e-commerce functions, Clover provided functions that many small businesses did not want or need. Accordingly, beginning in the latter half of 2024,  many legacy Payeezy merchants left Clover for competitors like Square, Toast, and Shopify.

7.     Despite the foregoing, Company management represented that Clover's early 2024 growth was fueled by new merchant business, signaling to the investing public that the Company's growth was sustainable. Further, Company management failed to disclose that Clover was suffering from significant merchant attrition and market share erosion.

8.     The truth emerged over a series of partially corrective disclosures beginning on April 24, 2025, when the Company reported decelerating GPV growth for the first quarter of 2025.

9.     On this news, the price of Fiserv stock declined 18.5%, from a close of $217.10 per share on April 23, 2025 to a close of $176.90 per share on April 24, 2025.

10.     Despite the disclosure, the price of Fiserv stock remained artificially inflated as Company management continued to issue materially false and misleading statements, overstating the Company's growth prospects and failing to disclose the extent of the Company's merchant attrition issues.

11.     On May 15, 2025, the Company disclosed that Clover's GPV growth deceleration would persist throughout 2025. On this news, the price of Fiserv stock declined 16.2%, from a close of $189.86 per share on May 14, 2025 to a close of $159.13 per share on May 15, 2025.

12.     On July 23, 2025, the Company announced a downward revision to its fiscal year 2025 guidance and reported a deceleration in Merchant Solutions segment revenue growth to 9% year-over-year, down from 11% in the previous quarter. On this news, the price of Fiserv stock declined 13.9% from a close of $165.98 per share on July 22, 2025 to a close of $143.00 per share on July 23, 2025. As the market digested the news over the following week, the price of Fiserv stock continued to decline, reaching $138.94 per share on July 31, 2025.

13.     Then on October 29, 2025, Defendants disclosed that prior 2025 guidance relied on assumptions regarding outsized business-volume growth, broad-based productivity improvements, record sales activity, and short-term revenue and expense initiatives that, even with "strong execution," would have been "objectively difficult" to achieve. Accordingly, Defendants cut EPS and revenue guidance beyond the previously-reduced guidance from July 2025.

14.     On this news, the Company's stock price fell 44%, from a close of $126.17 per share on October 28, 2025 to $70.60 per share on October 29, 2025.

4

15.     As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

19.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District and a substantial portion of the transaction and wrongs complained of herein occurred in this District. Moreover, the E.D. Wis. Securities Class Action is pending in this District.

**PARTIES**

**Plaintiff**

23.    Plaintiff is, and has been at all relevant times, a shareholder of Fiserv.

**Nominal Defendant**

24.    Nominal Defendant Fiserv is incorporated under the laws of Wisconsin, with its principal executive offices located at 600 N. Vel R. Phillips Avenue, Milwaukee, Wisconsin 53203. Fiserv common stock trades on the NASDAQ under the ticker symbol "FISV."

**Individual Defendants**

25.    Defendant Mike Lyons ("Lyons") has served as Fiserv's Chief Executive Officer ("CEO") and as a member of the Board since May 6, 2025 and as Fiserv's President since January 27, 2025. Defendant Lyons is named as a defendant in the Securities Class Actions.

26.    Defendant Henrique de Castro ("de Castro") has served as a member of the Board since 2019, previously serving as a director of First Data. According to the Company's public filings, Defendant de Castro received $360,035 in 2024 in compensation from the Company. As of February 28, 2025, Defendant de Castro beneficially owned 17,838 shares of Fiserv common stock, worth roughly $4.2 million.[1]

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $235.69 per share closing price of Fiserv stock on February 28, 2025.

27. Defendant Stephanie Cohen ("Cohen") has served as a member of the Board since March 2025 and serves as a member of the Audit Committee.

28. Defendant Harry F. DiSimone ("DiSimone") has served as a member of the Board since 2018 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant DiSimone received $380,035 in 2024 in compensation from the Company. As of February 28, 2025, Defendant DiSimone beneficially owned 11,003 shares of Fiserv common stock, worth roughly $2.6 million.

29. Defendant Lance Fritz ("Fritz") has served as a member of the Board since February 2024 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Fritz received $393,879 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Fritz beneficially owned 981 shares of Fiserv common stock, worth $231,212.

30. Defendant Ajei Gopal ("Gopal") has served as a member of the Board since March 2024. According to the Company's public filings, Defendant Gopal received $370,477 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Gopal beneficially owned 1,044 shares of Fiserv common stock, worth $246,060.

31. Defendant Wafaa Mamilli ("Mamilli") has served as a member of the Board since 2021. According to the Company's public filings, Defendant Mamilli received $360,035 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Mamilli beneficially owned 5,609 shares of Fiserv common stock, worth roughly $1.3 million.

32. Defendant Charlotte Yarkoni ("Yarkoni") has served as a member of the Board since 2023 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Yarkoni received $360,035 in 2024 in compensation

7

from the Company. As of February 28, 2025, Defendant Yarkoni beneficially owned 2,069 shares of Fiserv common stock, worth $487,643.

**Former Director Defendants**

33.     Defendant Heidi G. Miller ("Miller") served as a member of the Board from 2019 until May 2025.

34.     Defendant Doyle R. Simons ("Simons") served as Chairman of the Board since April 2025 and as a member of the Board since 2007. According to the Company's public filings, Defendant Simons received $450,060 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Simons beneficially owned 134,418 shares of Fiserv common stock, worth roughly $31.7 million.

35.     Defendant Kevin M. Warren ("Warren") served as a member of the Board since 2020 and served as Chair of the Audit Committee. According to the Company's public filings, Defendant Warren received $382,535 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Warren beneficially owned 6,787 shares of Fiserv common stock, worth roughly $1.6 million.

**Former Officer Defendants**

36.     Defendant Frank J. Bisignano ("Bisignano") joined the Company as its CEO in 2020. In addition to this role, Defendant Bisignano became the Chairman of the Board in 2022. Defendant Bisignano served in both of these roles until his resignation and departure from the Company on May 6, 2025. Defendant Bisignano is named as a defendant in the S.D.N.Y. Securities Class Action. According to the Company's public filings, Defendant Bisignano received $23,774,483 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Bisignano beneficially owned 3,176,650 shares of Fiserv common stock, worth roughly $748.7

8

million.

37.     Defendant Robert W. Hau ("Hau") served as the Company's Chief Financial Officer ("CFO") since 2016. Defendant Hau is named as a defendant in the Securities Class Actions. According to the Company's public filings, Defendant Hau received $6,406,705 in 2024 in compensation from the Company. As of February 28, 2025, Defendant Hau beneficially owned 350,030 shares of Fiserv common stock, worth roughly $82.5 million.

38.     Defendant Kenneth F. Best ("Best") served as the Company's Chief Accounting Officer ("CAO") since 2016. Defendant Best is named as a defendant in the S.D.N.Y. Securities Class Action.

**Non-Parties**

39.      Non-party Gordon Nixon ("Nixon") joined the Board in January 2026. Nixon serves as Chairman of the Board.

40.     Non-party Céline Dufétel ("Dufétel") joined the Board in January 2026. Dufétel is a member of the Audit Committee.

41.     Non-party Gary Shedlin ("Shedlin") joined the Board in January 2026. Shedlin is Chair of the Audit Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of Fiserv, and because of their ability to control the business and corporate affairs of Fiserv, the Individual Defendants owed Fiserv and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fiserv in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fiserv and its shareholders so as to benefit all shareholders equally.

9

43. Each director and officer of the Company owes to Fiserv and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

44. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fiserv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45. To discharge their duties, the officers and directors of Fiserv were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fiserv, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Fiserv implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition,

10

performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

48.     To discharge their duties, the officers and directors of Fiserv were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fiserv were required to, among other things:

a)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Wisconsin, the United States, and pursuant to the Fiserv's Code of Conduct and Business Ethics (the "Code of Conduct") and internal guidelines;

b)      Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

c)      Remain informed as to how Fiserv conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry and to take steps to correct such conditions or practices;

d)      Establish and maintain systematic, accurate records and reports of the business and internal affairs of Fiserv and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be

11

made of, said reports and records;

e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fiserv's operations would comply with all laws and Fiserv's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f) Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49. Each of the Individual Defendants further owed to Fiserv and the shareholders the duty of loyalty requiring that each favor Fiserv's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

50. At all times relevant hereto, the Individual Defendants were the agents of each other and of Fiserv and were at all times acting within the course and scope of such agency.

51. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fiserv.

12

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

54.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

55.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Fiserv, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

56.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

13

57. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Fiserv, and at all times operated within the course and scope of that agency.

**FISERV'S CODE OF CONDUCT**

58. Fiserv's Code of Conduct begins with a message from Defendant Lyons, which states, in pertinent part:

> The way we work matters, with accountability, integrity and a straightforward approach topping the list of how we do what we do at Fiserv. Our Code of Conduct & Business Ethics (the "Code") serves as the foundation for ethical behavior across our company and the expectations that govern associates, representatives and affiliates of Fiserv. It explains how we, through our actions, personify our Fiserv Values and interact with our clients, business partners, each other and the communities in which we operate.

> We regularly review the Code and update it to ensure we continue to uphold the highest standards of conduct, which are expected of us as an industry leader. Regardless of role or location, each of us has the important responsibility to understand and comply with the letter and spirit of the Code. By doing so, we not only build trust with our clients, business partners and communities, we strengthen our global team.

59. The Code of Conduct applies to "all Fiserv associates and board members" and violations of the Code of Conduct will lead to "disciplinary action, up to and including termination of employment."

60. In a subsection titled "Honest Business Dealings," the Code of Conduct states, in pertinent part:

> It is imperative that each of us does our part to uphold and maintain the excellent reputation of our company in all of our business dealings.

> Fiserv operates in multiple jurisdictions, and the laws affecting international business are complicated. Every transaction must be carefully evaluated to ensure compliance with all applicable rules and regulations.

14

61.     In a subsection titled "Avoiding Conflicts of Interest," the Code of Conduct states, in pertinent part, that "[a] conflict of interest, or even the appearance of one, can have a negative impact on our reputation and our bottom line. Your personal business interests should never conflict – or appear to conflict – with the interests of Fiserv."

62.     In a subsection titled "Accurate Recordkeeping," the Code of Conduct states, in pertinent part:

> Fiserv is a reporting company under federal securities laws and is subject to rules governing public disclosure of material information. Fiserv also operates in various jurisdictions around the world that require statutory audits and other government reporting. Fiserv adheres to a policy of full, fair, accurate, timely and understandable disclosure in all reports and documents that we file with or submit to the Securities and Exchange Commission, in other compliance reporting and in our public communications.
>
> We all have a responsibility to keep accurate business records in ways that are legally compliant and are consistent with our internal controls and policies. As a Fiserv associate, you have a responsibility to:
>
> - Create accurate, timely and complete records that represent the true state of affairs and nature of activities; never intentionally misrepresent facts, omit material information or otherwise mislead readers
>
> - Never create or approve any false, misleading or fraudulent records or cause any other person to do so
>
> - Never cause or influence any other person to mislead any accountant, auditor or other person in connection with the preparation, audit, review or examination of financial statements or records of Fiserv, and/or in connection with any document or report required to be filed with the U.S. Securities and Exchange Commission or any other governmental authority

63.     With respect to Fiserv's corporate assets, the Code of Conduct states that associates must "work to protect them from misuse, theft, carelessness and waste."

## FISERV'S AUDIT COMMITTEE CHARTER

64.     Pursuant to Fiserv's Audit Committee Charter, the purpose of the Audit Committee is to:

[P]rovide independent review and oversight of the integrity of the Corporation's accounting and financial reporting processes and financial statements, the system of internal controls that management and the Board of Directors have established, the independent auditors' qualifications and independence, the performance of the Corporation's internal audit function and the Corporation's compliance with legal and regulatory requirements.

65.     In a section titled "Review of Financial Statements and Disclosures," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- <u>Review of Financial Statements</u> - The Committee shall review and discuss the financial statements and related disclosures with management and the independent auditor, including interim financial statements and annual financial statements, disclosures made in management's discussion and analysis of financial condition and results of operations and the independent auditor's report with respect to the Corporation's financial statements. The Committee shall review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles, and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off balance sheet structures on the Corporation's financial statements.

- <u>Communications with the Auditor</u> - The Committee shall review and discuss with the independent auditor the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC.

- <u>Review of Disclosures</u> - The Committee shall review the disclosures made by the Corporation's CEO and CFO during their certification process for the Form 10-K and Form 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting or any fraud, whether or not material, involving management or other employees who have a significant role in the Corporation's internal control over financial reporting.

- <u>Recommendations</u> - The Committee shall recommend to the Board of Directors whether the audited financial statements should be included in the Annual Report on Form 10-K.

16

- <u>Earnings Releases and Other Significant Disclosures</u> - The Committee shall discuss with management the Corporation's earnings press releases, including the use of non-GAAP information, the Corporation's earnings guidance, and other significant disclosures, such as the Corporation's corporate social responsibility report.

66.     In a section titled "Review of Internal Reports and Processes," the Audit Committee

Charter tasks the Audit Committee with the following responsibilities:

- <u>Review and Oversight of Risks</u> - The Committee shall oversee, and inquire of management, the Chief Audit Executive, and the independent auditor about, financial risks and financial reporting matters (including tax, accounting, disclosure controls and procedures, and internal control over financial reporting). In this regard, the Committee shall annually review, jointly with the Risk Committee, the Enterprise Risk Management program of the Corporation including the identification of top risks. The Committee chairperson may consult with the chairperson of any other Board committee, including the Risk Committee, to organize and conduct joint meetings on topics that are of common interest.

- <u>Oversight of Corporation's Internal Control Process</u> - The Committee shall monitor the Corporation's significant internal control process, including: the process of preparing the interim and annual financial results; disclosure controls and procedures; corporate audit function; and periodic review and approval of the code of conduct and business ethics. As and when required by SEC rules, obtain reports from management regarding its evaluation of the Corporation's disclosure controls and procedures and internal control over financial reporting. As and when required by SEC rules, obtain the independent auditor's attestation report on management's assessment of the Corporation's internal control over financial reporting.

- <u>Review Legal, Regulatory and Compliance Issues</u> - The Committee shall review and consider legal and regulatory matters that may have a material impact on the Corporation's financial statements; material litigation matters; reports of evidence of material violations of the law or the Corporation's code of conduct and business ethics; and fraud.

## <u>SUBSTANTIVE ALLEGATIONS</u>

### *Background*

67.     Fiserv is a global provider of financial technology services and solutions, including

payment processing, digital banking, fraud and risk management, and core banking solutions. The

17

Company's operations fall into two reportable business segments: Merchant Solutions and Financial Solutions.

68.     In July 2019, Fiserv acquired First Data and its subsidiaries, including Clover, a company that operated a cloud-based POS and payment processing platform designed to help businesses accept payments, manage sales, and run their operations more efficiently. At the time, the Company touted the acquisition as an opportunity to strengthen its position in the payment industry and expand its merchant capabilities. Clover operates under the Company's Merchant Solutions business segment.

69.     Clover has since become the Company's flagship product, primarily generating revenue as a payment processing platform, collecting transaction fees from merchants as a percentage of the total transaction amount. Clover additionally generates revenue through POS hardware sales and subscription-based VAS, including payroll administration software, merchant financing, and cash flow management solutions. In addition to revenue, a key indicator of Clover's growth and performance is GPV, a measure of the total monetary value of transactions processed through the Clover platform.

70.     In mid-2023, Fiserv began to phase out Payeezy, its previous payment processing platform for small businesses, and started forcibly migrating its Payeezy merchants at up to 200,000 locations to Clover. This back book conversion fueled significant growth to Clover's revenue and GPV in the first half of 2024.

71.     However, the migration to Clover represented a significant cost increase for merchants. While Payeezy was an affordable platform, providing only basic e-commerce functions, Clover provided functions that many small businesses did not want or need. Accordingly, beginning in the latter half of 2024,  many legacy Payeezy merchants left Clover for

18

competitors like Square, Toast, and Shopify.

72. Despite the foregoing, the Individual Defendants represented that Clover's early 2024 growth was fueled by new merchant business, signaling to the investing public that the Company's growth was sustainable. Further, the Individual Defendants failed to disclose that Clover was suffering from significant merchant attrition and market share erosion.

***False and Misleading Statements During the Relevant Period***

73. On July 24, 2024, the Company issued a press release, announcing its second quarter 2024 financial results (the "2Q24 Press Release"). The 2Q24 Press Release reported 28% growth in the Company's Merchant Solutions business segment and included an investor presentation, which touted "$313 billion Clover annualized GPV, up 17%."

74. During a related earnings call, hosted by the Company on the same day (the "2Q24 Earnings Call"), Defendant Bisignano stated:

> ***Clover revenue grew 28% in the second quarter on an annualized payment volume growth of 17%. The spread between revenue and volume growth continues to reflect a higher penetration of value-added solutions, continued channel mix shift, and value-based pricing.*** VAS penetration stayed constant sequentially at 20% in Q2, an improvement from prior years where we typically see a seasonal decline from Q1 to Q2. VAS penetration was driven by growth in Clover Capital and the Clover SaaS package and should expand with several new offerings coming in the second half. ***Overall, we remain on pace to meet our 2026 targets.***[2]

75. Later during the 2Q24 Earnings Call, the following exchange occurred between Defendant Bisignano and an analyst from Morgan Stanley:

> **James E. Faucette – Morgan Stanley – Analyst**
> I want to go back to Clover and Clover growth. And one of the questions we get a lot is – you talked at your analyst meeting back in November – about using Clover and how the back book could contribute a little bit more going forward to that growth. But I'm wondering if you can talk through a little bit the sales cycle there and where your existing customers see value on Clover, and how you're feeling

---

[2] Unless indicated otherwise, all emphasis is added.

19

about that from a – and maintaining those customers from a competitive standpoint if they are reevaluating solutions, et cetera. Thanks a lot.

**Defendant Bisignano**

Thank you. Thanks, Jim. Good to hear from you. Hey. I mean, like, we've been really, really feeling good about the Clover strategy and continuing to refine it. Obviously, we know there will be a day where we're going to come back and say we've hit it directly into the back book, but we see so much front-book activity opportunity. Between our international, between our ISV, between how we're thinking about the verticals like services, like restaurants that we're continuing to build that product set, that VAS. Obviously, it's an outperformer in attrition across the total book. And we have the benefit of looking at attrition rates from everything. We look at them from what our ISO portfolios are attriting versus our ISV portfolios attriting versus our agent versus our direct book. *And we feel really, really good about how it's performed. We're continuing to ramp up our investment in value-added services and vertical expertise there. So, we've made a set of commitments, 3.5 and then 4.5 and pen rates and we think about the Merchant business being $10 billion and $12 billion and all of that feels really, really tight and on track.*

Obviously, I always have to say, we started Clover with seven engineers and three patents, and now we've got a global franchise. So, it's straight in our sights. Obviously, we have lots of other great things in our portfolio, but it also is the key to why we have 900 financial institutions. And I would expect over a period of time on this journey that if you ask me, we haven't ever made a commitment or guided how many financial institutions, but *you should expect us to continue to grow that at a double-digit number every year.*

76.     The following day, Fiserv filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q24 10-Q"), which referenced the Company's most recent annual report, stating that "[a]dditional information about market risks to which we are exposed is included within Item 7A of our Annual Report on Form 10-K for the year ended December 31, 2023" (the "2023 10-K"). The 2Q24 10-Q further represented that "[t]here were no significant changes to our quantitative and qualitative analyses about market risk during the six months ended June 30, 2024." Taken together, the foregoing statements signaled to investors that the 2023 10-K adequately informed investors of the risks facing the Company as of the filing of the 2Q24 10-Q.

77.     The 2023 10-K purported to warn investors of risks related to competitive and

technological challenges facing the Company's payment solutions:

> ***We operate in a competitive business environment and may not be able to compete effectively.***
>
> The markets for our products and services are highly competitive from new and existing competitors. Our principal competitors include other vendors and providers of financial services technology and payment systems, data processing affiliates of large companies, processing centers owned or operated as user cooperatives, financial institutions, independent sales organizations ("ISOs"), independent software vendors, payments companies and payment network operators. Our competitors vary in size and in the scope and breadth of the services they offer. Many of our larger existing and potential clients have historically developed their key applications in-house. As a result, we may compete against our existing or potential clients' in-house capabilities. In addition, we expect that the markets in which we compete will continue to attract new technologies and well-funded competitors, including large technology, telecommunication, media and other companies not historically in the financial services and payments industries, start-ups and international providers of products and services similar to ours.
>
> *       *       *
>
> We cannot provide any assurance that we will be able to compete successfully against current or future competitors or that competitive pressures faced by us in the markets in which we operate will not materially and adversely affect our business, results of operations and financial condition.
>
> ***If we fail to keep pace with technological change, we could lose clients or have trouble attracting new clients, and our ability to grow may be limited.***
>
> The markets for our products and services are characterized by constant and rapid technological change, evolving industry standards, frequent introduction of new products and services, and increasing client expectations. Our ability to respond timely to these changes, including by enhancing our current products and services and developing and introducing new products and services, will significantly affect our future success. In addition, the success of certain of our products and services rely, in part, on financial institutions, business partners and other third parties promoting the use of or distributing our products and services. If we are unsuccessful in developing, marketing and selling products or services that gain market acceptance, or if third parties insufficiently promote or distribute our products and services, it would likely have a material adverse effect on our ability to retain existing clients, to attract new ones and to grow profitably.

78.     The 2023 10-K further purported to warn of risks related to the loss of customers:

*If we are unable to renew contracts on favorable terms or if contracts are terminated prematurely, we could lose clients and our results of operations and financial condition may be adversely affected.*

Failure to achieve favorable renewals of client contracts could negatively impact our business. At the end of the contract term, clients have the opportunity to renegotiate their contracts with us or to consider whether to engage one or more of our competitors to provide products and services or to perform the services inhouse. Some of our competitors may offer more attractive prices, features or other services that we do not offer, and some clients may desire to perform the services themselves. Larger clients may be able to seek lower prices from us when they renew or extend a contract or the client's business has significant volume changes. In addition, larger clients may reduce the services we provide if they decide to move services in-house. Further, our small merchant business clients may seek reduced fees due to pricing competition, their own financial condition or pressure from their customers.

We also have contracts with U.S. federal, state and local governments. The contracts with these clients may contain terms that are not typical for nongovernment clients, such as the right to terminate for convenience, the right to unilaterally modify or reduce work to be provided under the contract, significant or unlimited indemnification obligations and being subject to appropriation of funds for the government contract program. In addition, if any of our government contracts were to be terminated for default, we could be suspended or debarred from contracting with that entity in the future, which could also provide other government clients the right to terminate.

These factors could result in lower revenue from a client than we had anticipated based on our agreement with that client. If we are not successful in achieving high contract renewal rates and favorable contract terms, if contracts are terminated, or if we are prevented from performing work for these clients in the future, our results of operations and financial condition may be materially and adversely affected.

79. These risk disclosures were materially misleading because they represented as merely hypothetical risks that had already materialized by the time the 2Q24 10-Q was filed.

80. On October 22, 2024, the Company issued a press release, announcing its third quarter 2024 financial results (the "3Q24 Press Release"). The 3Q24 Press Release reported 24% organic revenue growth in the Company's Merchant Solutions business segment and included an investor presentation, which touted "$311 billion Clover annualized GPV, up 15%."

22

81.     During a related earnings call, hosted by the Company on the same day (the "3Q24 Earnings Call"), Defendant Bisignano stated the following during his opening remarks:

Let me share some of the many highlights of the quarter. ***It was another strong quarter of growth in the Merchant Solutions segment, with organic revenue up 24%. At Clover, revenue grew 28%*** and value-added services penetration reached 21%, up 1 percentage point from Q2.

\*          \*          \*

As I look across all the new initiatives we are rolling out, I am pleased with how the vision and investment ***we put into motion five years ago has brought Fiserv to a strong position*** today, one that's clearly hard to replicate. The results show that we are executing on mandates for each of our two ecosystem, merchants and financial institutions. ***This will continue in many ways, as we add to our Clover portfolio, extend services to enterprise merchants, expand issuing to new verticals and geographies, enable more real-time payments, modernize core banking systems, add partners, grow internationally, and continue to use distribution data, and more.***

82.     Also during the 3Q24 Earnings Call, Defendant Hau stated:

***Clover revenue grew 28% in the third quarter on an annualized payment volume growth of 15%.*** VAS penetration increased sequentially by 1 point to 21% in Q3, driven by growth in Clover Capital and the Clover SaaS package.

\*          \*          \*

In Q4, we will be rolling out new vertical software plans for retail and services. With this progress, ***we remain on track to achieve our 2026 Clover targets of $4.5 billion in revenue*** and VAS penetration of 27%.

83.     During the 3Q34 Earnings Call, the following exchange occurred between Defendant Hau and an analyst from Bank of America Merrill Lynch:

**Jason Kupferberg – Bank of America Merrill Lynch – Analyst**
Good morning, guys. Just a couple of questions on Clover. I know revenue growth was steady here. Volume growth ticked down a little bit. Just any thoughts on Q4 expectations for those metrics? I think the volume comps get a little bit harder, revenue also next quarter. So, just wanted to get a sense of how we should be thinking about near-term trajectory there. I know you've got some new country launches, product launches to support it.

**Defendant Hau**

Yeah, Jason, good morning. So, yes, we continue to see good overall revenue and volume growth out of our Clover solution. As you know, we've got a target to be $4.5 billion by 2026. That gets us – we needed about a 28% compound growth rate to achieve that, exactly where we were for the quarter, it's where we are on a year-to-date basis. A key part of that is continuing to add value-added services. That ticked up 1 point to 21% of revenue.

Overall, volume remains good. It obviously isn't as strong as it was last year. Some of that is very strong last year. So a little bit of a "difficult comp," but also the consumer, while still strong, still spending, has certainly eased a bit. We saw that last quarter. We saw that continue again this quarter, but *we feel good about where that spending is right now and what we see going into the future.*

84.     Defendant Bisignano was then asked about the Company's Clover revenue target

of $4.5 billion in 2026 during the following exchange:

**James E. Faucette – Morgan Stanley – Analyst**

Thank you so much. I wanted to follow up on the SMB bundle, and this ties a little bit into Dan's question, but it seems like there's a lot of capability expansion that's happening within the Clover ecosystem and then looking at new ways to go to market. How should we be thinking about – I know you gave some targets for back book and some of those things to get to the $4.5 billion target. But how should we be thinking about, like, the roles that those will play and if there's been any change in your thinking in terms of mix or type of customers and sets within that Clover target? Thank you.

**Defendant Bisignano**

Yeah. I know there's only one question allowed, but that felt like five. Good job, James. Let me try it. Like, first of all, in some ways, they're not really inside this company that there's a ton of new thoughts. We always have a lot of R&D going on that historically, and the IR team don't always love me for it, but they are more apt to talk to you about when we're getting to market than what's in the R&D shop.

So *this idea about us bringing more capability to the SMB space has always been there.* I think if you go back to our acquisition of Ondot and us embedding it in mobility, and then it became – let's think about XD and a new product. But then you start saying to yourself, we could deliver this way beyond Clover and XD. We can integrate it all. We can put our SpendLabs acquisition in there. Oh, boy, we can end up helping our FIs grow and other channel partners and future partners to be signed up. That's why we are ultimately a partner of choice for people who want to partner in the SMB space because of our capability.

So I think you got to think about it that, yes, *there may be more back book swept up in there because there's a reason beyond switching out your FD150 for a*

24

***Clover Station, now you have a much broader capability***. None of this back book, if it happened, would ever, more than our natural kind of rate, which we talked about of merchant churn, going from an older device to a newer. But I think you're seeing the size of the opportunity to actually impact Clover more than we might have because of the full capability set. Thank you. I think you're on the right track there.

85.     The following day, Fiserv filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q24 10-Q"), which incorporated by reference the materially misleading risk disclosures that were contained in the 2023 10-K.

86.     On December 4, 2024, Defendant Hau participated at the UBS Global Technology & AI Conference on behalf of the Company, during which the following exchange occurred:

**Timothy E. Chiodo – UBS – Analyst**
We're going to move on to non-Clover SMB. So in the model, it's roughly $3.7 billion or so of revenue last year. We understand about two-thirds of that or so is in the US. We generally think about that as a fast growing international business for the roughly one-third of it and then a slower growth or possibly the next growth, US non-Clover SMB. But that's okay. Right. There is a plan to address that via back book conversion. That's more of a 2026 event. Could you just talk to us a little bit about what is the makeup of the US non-Clover SMB business?

**Defendant Hau**
Yeah. So, this is a great business for us. As you say, it's about $3.7 billion out of our almost call it $5.8 billion of revenue, almost $6 billion of small business overall revenue. ***Clover obviously growing very rapidly. We expect that non-Clover business to generally grow mid-single digits globally and we continue to sell it. We continue to see growth in existing clients using – as our small businesses grow, so does our revenue and we continue to sell it.*** Obviously, we believe Clover is a great solution, but it isn't necessarily the solution for our small businesses. Not every small business needs to have a full blown operating system. Some just like running their small business. The example I love to give is I'm running a pizzeria because I love making pies. I got five tabletops. I don't need a fancy full blown operating system. Having a terminal on my car is more than fine, and we're happy to sell that service to those clients.

\*     \*     \*

**Timothy E. Chiodo – UBS – Analyst**
We're going to move to the Clover $4.5 billion target by 2026. A question that we often get from investors is the CAGR implied to get there is sort of in the high-20s or so on the revenue growth. And you've had a large gap between the volume

25

growth and the revenue growth because of the strength of the value-added services. So, the question we often get is implied in reaching that target from here, call it the mid-teens volume growth for Clover, is there an expectation of a mild acceleration in the volume growth to help support that target?

**Defendant Hau**
Yes. There's a number of drivers that get us from the roughly just over $2 billion last year to $4.5 billion. If you do the math that requires about a 28% CAGR. It doesn't mean we're going to grow 28% every day, every month, every quarter, every year. But broadly, *we're looking at a 28% growth to get there. By the way, first half – we've seen the first nine months of the year, we're about a 28% growth.* And that's a combination of continued volume, most definitely, not a massive change in volume. We're not counting on a big improvement in the macro economy to get us there. But the economy continues to operate kind of where it is right now.

We'll get a lift in volume as we expand internationally. So, that's part of the growth – or *the growth algorithm is additional volume as we expand internationally, but also selling more value-added services internationally.*

*     *     *

The value-added services, the new capabilities that I talked about in the first question, we continue to invest in bringing new capabilities, but also see further penetration of the existing capability. Part of the growth algorithm to get to that $4.5 billion is to see our value-added service penetration to go from 19% to 20%, 21%. By 2026, we'll be a 27% value-added service. So, *you'll actually see that spread between volume and revenue growth continue to widen as we see that value-added service penetration continue to grow.* And so, that's bringing new capabilities not only to those three verticals that I talked about, restaurant, retail and services, but also horizontal capability.

87.     On December 10, 2024, Defendant Bisignano participated at the Raymond James

TMT and Consumer Conference on behalf of Fiserv, during which the following exchange

occurred:

**John Davis – Raymond James – Analyst**
And just to go back to the merchant business here, so you laid out 12% to 15% organic growth at the Investor Day. Obviously, Clover is a big piece of that, clearly taking share. The industry is probably growing high single-digit. So, if we just double click on Clover, it's still growing close to 30%. You've laid out a target for $4.5 billion of revenue in 2026, which implies kind of high-20s growth from here, mid-teens to high-teens volume growth. So, just talk a little bit about the sustainability of that growth. What gives you confidence?

You mentioned Brazil and Mexico international rollout. You still haven't done much with the back book, but just help talk a little bit about the success at Clover. What's driving that sustained high level of growth into 2025 and 2026?

**Defendant Bisignano**
Yeah. Yeah. I have a smile on my face because I have an objective here to change our vernacular a little bit. Back book was never my term. It's my client base, right? What am I going to do with my client base? And generally, I'm in my client base, trying to sell more product and innovate with them. And so, here's the way I think about it, because really we were asking, it looks like you could get from here to there, but tell us how are you going to get from here to there. We have this fabulous distribution systems. And acquiring – we're in this world of acquiring new merchants and selling more products.

I don't have really fancy strategies, get more clients and bring in more product. And **we've been very successful at that.** So you closing pen rate going up. And if you think about, call it, circa approximately a 1,000 financial institutions, and then you see us do something like ADP, right? That's a great partnership. I love Maria Black, the CEO there. I always said, we should be able to do something together and put our teams together. And we came out with us distributing their product and them distributing our product. And so, it's very logical, I think. So, you could think about those type of partnerships. Then, you think about plus or minus 1,000 financial institutions. And I think in all of those, our pen rate in that installed base that they have can go up. Said differently, if I look at a lot of partnerships, I think we could double the amount of clients in those partnerships that we have. Then secondarily, I think **we're going to continue to create more partnerships because the reality is, Clover's darn good.** Clover, financial institution and partners like Clover and our ability to put more software. You'll hear us putting CashFlow Central on Clover. You'll look at us having Payroll through ADP on Clover. Those are all additive in a big way. And then you go outside the US, and you also bring it to your other distribution partners.

*    *    *

**John Davis – Raymond James – Analyst**
And maybe just to touch for a minute on the ex-Clover merchant business. Can you talk a little bit about the success you're having in enterprise, kind of other initiatives that are driving pretty healthy growth outside of Clover?

**Defendant Bisignano**
Yeah, well, I mean, I think look at, ultimately, we built Commerce Hub and we have an orchestration layer and you see us winning now in the enterprise and we'll call it omni-commerce, because a lot of our clients have it going both ways. But we got a solution that we believe can serve omni-commerce better than anybody else in the industry, because we're fabulous in store, but we're also fabulous at now the

27

ability given an orchestration layer, deliver more VAS into that, too, and be able to help them grow. So I'd say that there.

I would also say, we have an unbelievable ISV business. That was the byproduct of two acquisitions. One, we got a couple of dollars back in the day and BluePay and CardConnect, which one was an e-comm, one was – had an ISV. We brought it together. We use the technology of that to grow our agent business in a different way. And many of those are not necessarily Clover, but there are these technical integrations. Now, we do see a world where Clover shows up there, too. But right now, that would sit in a non – as you describe it, non-Clover business.

So, I think ***our product set is strong. I think our technical integrations are good. I think, we look at everybody we compete with and feel like, yeah, there's people ahead of us and things, but our ability to invest and our ability to have technical expertise and our client base's desire for us to win, all put together make us a long-term winner,*** I believe.

88.     On February 5, 2025, the Company issued a press release, announcing its fourth quarter and full year 2024 financial results (the "4Q24 Press Release"). The 4Q24 Press Release reported 11% revenue growth in the Company's Merchant Solutions business segment and included an investor presentation, which touted "$310 billion Clover annualized GPV, up 14%."

89.     During a related earnings call, hosted by the Company on the same day (the "4Q24 Earnings Call"), Defendant Bisignano stated the following during his opening remarks:

***We added large enterprise clients, both traditional and e-commerce merchants, on the strength of our unified offering, modern gateway and growing value-added solutions portfolio. At Clover, we laid the foundation for continuing our strong growth*** as we released new software, services and hardware offerings and added three new countries.

***We extended merchant acquiring services to more financial institutions focused on winning small business clients***. We built solutions to help SMBs navigate the complexity of running their businesses. Managing cash flow, in particular, is one of the biggest challenges. It's ineffective, time consuming, and expensive.

90.     Also during the 4Q24 Earnings Call, Defendant Hau stated:

Small business organic and adjusted revenue growth in the quarter was 24% and 12%, respectively, on payments volume growth of 4%. Clover revenue reached $2.7 billion in 2024 with nearly 90% in our small business line reporting. Clover revenue grew 29% in both the quarter and full year on Q4 annualized payment

28

volume growth of 14%. ***This spread reflects growth in value-added solutions, some targeted value-based pricing actions and strong hardware sales.***

*　　*　　*

Drilling down by segment, for Merchant Solutions, ***we see organic revenue growth of 12% to 15% in 2025, driven mostly by strong growth in Clover***, as we reach our $3.5 billion revenue target, including an increase in VAS penetration to the 25% outlook. Our ability to achieve these goals is supported by opportunities we advanced in 2024 with five new hardware rollouts; new features and functionality for our three focused verticals of restaurant, services and retail; and three new geographies; Brazil, Mexico and Australia.

***We expect the small business line to grow above segment average driven by Clover***. Enterprise should be slightly below the segment average to more normal levels following the end of transitory benefits in Argentina, and some one-time revenues associated with the large PayFac win.

*　　*　　*

While we don't give quarterly guidance, I think it's instructive to consider the quarterly cadence this year. Overall, ***we expect growth to be weighted towards the second half of the year***. Several reasons for this. First, we've had multiple new product rollouts in late 2024 that we expect will gain traction over time in the market from Clover vertical software to CashFlow Central and the SMB suite.

Second, we had several important new wins that will take time to implement and generate revenue, including Target expected to go live in late March and Verizon in September. Third, we entered three new countries with pilots in the fourth quarter and full-scale go-to-market efforts just getting underway this year.

91.　　On February 20, 2025, Fiserv filed its 2024 annual report on Form 10-K with the SEC (the "2024 10-K"), which was signed by Defendants Bisignano, Hau, Best, de Castro, DiSimone, Fritz, Gopal, Mamilli, Miller, Simons, Warren, and Yarkoni. The 2024 10-K included the same misleading risk disclosures that were contained in the 2023 10-K and additionally purported to warn investors of the following risk related to increased competition:

> In addition, participants in the financial services, payments and technology industries may merge, create joint ventures or engage in other business combinations, alliances and consolidations that may strengthen their existing products and services or create new products and services that compete with ours.

29

92. On March 11, 2025, Defendant Hau participated at the Wolfe Research FinTech Forum on behalf of Fiserv. During the conference, Defendant Hau stated the following in response to a question regarding the Company's growth prospects:

> From a Fiserv standpoint, obviously, macro matters, but *we see good growth*. When we gave the guide for the year, we guided organic growth for the company at 10% to 12%. But we also did upfront, and this is not a macro environment per se, this was an original guidance back in early February with our fourth quarter, that *we expected growth to ramp into the second half of the year, and we continue to see that. And that's really driven by things like CashFlow Central coming into market, the new partnerships we have with ADP where we're cross-selling each other products, payroll through the Clover solutions, selling payroll, them selling Clover*. Things like some of the new products and new software that got rolled out last year continue to accelerate.

93. Later during the conference, the following exchange occurred between Defendant Hau and an analyst from Wolfe Research:

> **Darrin Peller – Wolfe Research – Analyst**
> And just – and Clover again, I mean in terms of the trajectory you expect for the year, how – it's just – look, it's coming off of a really strong year. So thinking about comps and just thinking about trajectory going forward.
>
> **Defendant Hau**
> Yeah. So in March of 2022, we laid out our goal for Clover revenue in 2025. So March of 2022, we said we expect to be $3.5 billion of revenue at the end of 2025. And that was about a 28% to 30% compound annual growth rate to achieve that.
>
> **Darrin Peller – Wolfe Research – Analyst**
> Yeah. Yeah.
>
> **Defendant Hau**
> Some of you in this room might have thought we were a little bit crazy in laying that goal out. But if fast forward now, the last couple of years, we've seen 28%, 29% growth. We closed out last year 2024 at $2.7 billion. And to achieve that $3.5 billion, we need to continue that 29% growth. And that is the outcome or the benefit of that international expansion, that new products, both in terms of hardware and software, continuing to build out our distribution channel. *We have good visibility into the Clover growth confidence in that international channel.*

*     *     *

**Darrin Peller – Wolfe Research – Analyst**

Okay. And then just one question we get a lot is the back book, right, whether or not you're actually really benefiting from Clover's growth from just converting business over from your existing business. Where are you on that in terms of whether it's a percent number or anything else you can give us?

**Defendant Hau**

Yeah. So that dialogue has shifted over the last several years. ***Four or five years ago, we got the question around the back book from the standpoint of, well, yeah, great, you're growing Clover, but it's all back book conversion. So it's not real. And back then, the answer was no. Actually, that Clover revenue was actually driven by new clients to Fiserv. And about 10% of the Clover growth back then was from back book conversion. So, yes, we do have merchant clients who are not using Clover convert to Clover and it provides about a 10% lift.***

Fast forward today, the question is more of, geez, when are you going to go attack that back book and provide even more growth? Today, ***we're about 10% of our growth comes from back book.***

**Darrin Peller – Wolfe Research – Analyst**

Still.

**Defendant Hau**

And that's a combination of merchants deciding to move from a "simple dumb terminal" on their counter to wanting a full-blown operating system and seeing the value, the benefit of having all of those value-added solutions embedded in the extra data and information they can get by running Clover and increase the efficiency of their operation, so deciding to convert. It's also some sales activity. But for the most part, our effort is around bringing on new clients and continuing to expand the number of merchants, small businesses that are using our solutions and growing that way.

94.      On March 18, 2025, Defendant Hau participated at the Bank of America Electronic

Payments Symposium on behalf of Fiserv, during which the following exchange occurred:

**Jason Kupferberg – Bank of America – Analyst**

So, the back book also comes up sometimes as a Clover driver. And I think originally at the Investor Day, you guys had said, oh, back book maybe contributes 10%.

**Defendant Hau**

Right.

**Jason Kupferberg – Bank of America – Analyst**

And I think that's more or less been your experience since the time of the Investor

Day. As we look out at your 2026 target, does that 10% get a little bit bigger?

**Defendant Hau**
Yeah. ***So, the 10% you were referring to is a number actually we've been seeing for several years.***

**Jason Kupferberg – Bank of America – Analyst**
Right.

**Defendant Hau**
I can tell you for the last five years that I've been associated with the merchant side of our business, that's been the case. And what that is is ***roughly 10% of the Clover growth is driven by back book conversion. Or said another way, 90% of new Clover revenue growth is from clients that are new to Fiserv from a merchant acquiring standpoint, and that's been very consistent for the last five years***. I would expect that to kind of hang in there. ***For this year, that's what we're seeing right now and I expect to see the balance of this year. What we said during Investor Day back in November is as we hit 2026, 2027, 2028, we'd expect that to modify a little bit***. It's not something that we don't need that to go to 50% to get to the $4.5 billion. But at some point in time, it would make sense to more proactively address that back book and November of 2023 – 2026 look like a time that we'd probably want to do that.

95.    On April 2, 2025, Fiserv filed a proxy statement on Form DEF 14A with the SEC (the "2025 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Bisignano, Lyons, Cohen, de Castro, DiSimone, Fritz, Gopal, Mamilli, Simons, Warren, and Yarkoni to the Board and the compensation of certain of the Company's executive officers, including Defendants Bisignano and Hau.

96.    The 2025 Proxy continued to tout the Company's purportedly positive financial results, highlighting "organic revenue growth of 16% [during 2024] compared to 2023."

97.    The 2025 Proxy represented that Fiserv "***help[ed] clients achieve best-in-class results through a commitment to innovation and excellence in areas including*** account processing and digital banking solutions; card issuer processing and network services; payments; e-commerce; merchant acquiring and processing; and ***the Clover cloud-based point-of-sale and business management platform***."

32

98.    With respect to the Company's internal controls over financial reporting, the 2025 Proxy stated that the "audit committee provides independent review and oversight of the accounting and financial reporting processes and consolidated financial statements of Fiserv, Inc., the system of internal controls that management and the board of directors have established, the audit process and the results of operations of Fiserv, Inc. and its financial condition."

99.    With respect to the Company's risk management function, the 2025 Proxy stated:

We maintain an enterprise risk management (ERM) program with a top risk register and structured risk assessment process that supports strategic planning and decision making. As part of our ERM program, for each category of risk, we determine an appropriate risk appetite. We consider the impact and likelihood of our top risks, and our ability to manage those risks through mitigating controls. The risk assessment process also determines risk ratings, such that the management of significant risks can be prioritized. On an ongoing basis, we identify, categorize, assess, respond to, and monitor risks, escalating mitigation efforts as needed. We consider the ways in which risks may affect our business by measuring the impact of those risks against a consistent set of criteria, which include the potential impact to our operations, our financial performance, compliance and legal, our reputation, and our business strategy. Response plans are developed for residual risks that are above the acceptable tolerance level.

The board of directors believes that its current leadership structure best positions it to oversee the risks faced by the company today based on the company's operations and strategic goals and the qualifications and skills of our directors. The significant majority of our board are independent and all four of our standing board committees are chaired by independent directors. Our lead independent director has a robust set of responsibilities under our governance guidelines that enable him to provide an independent perspective on significant matters, including the management of risk. Effective upon Mr. Bisignano's resignation, Mr. Simons, our current lead independent director, will become non-executive Chairman of the Board.

The board of directors and its committees provide oversight of risk within the scope of their respective responsibilities, including those described below.

100.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose: (i) Fiserv forced Payeezy merchants to convert to its Clover platform as a result of cost issues and other problems with the Payeezy platform; (ii) these conversions fueled temporary and

33

unsustainable growth in Clover's revenue and GPV; (iii) the growth related to the conversions obscured a slowdown in the Company's Merchant Solutions business segment; (iv) shortly after the conversions, the Company began losing market share to competitors due to the relatively high cost of Clover, as well as other issues, including inadequate customer service; (v) despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls, the Board and its committees were failing to adequately exercise these functions and were causing and/or permitting the Company to issue the false and misleading statements detailed herein; and (vi) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Gradually Emerges as the Individual Defendants Continue to Issue Materially False and Misleading Statements***

101.    The truth began to emerge during an earnings call on April 24, 2025 (the "1Q25 Earnings Call"), when the Company reported disappointing financial results for the first quarter of 2025. Specifically, Fiserv reported 8% in GPV growth for the quarter, down significantly from 2024 growth rates, which ranged from 14% to 17%. The material decline in GPV growth rates was accompanied by relatively flat revenue growth for the quarter. Defendant Hau attributed the spread between Clover revenue growth and GPV growth to, *inter alia*, strong one-time Clover hardware sales and VAS penetration within existing merchants:

> Clover revenue growth was a solid 27% against the highest growth quarter last year. There are several reasons for the spread between revenue and volume growth including a two-point gain sequentially in the penetration rate of Clover value-added services to 24%. Roughly one-third of the spread came from strong Clover hardware sales. As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market. Such sales bode well for our Processing and VAS revenue going forward.

Another nearly one-third came from growth in anticipation and Clover capital. As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VASS as well.

102. Analysts reacted negatively to the disclosures, with J.P. Morgan analysts noting "the widest spread between revenue and volume in our model's history, *raising concerns about sustainability of premium growth.*"

103. On this news, the price of Fiserv stock declined 18.5%, from a close of $217.10 per share on April 23, 2025 to a close of $176.90 per share on April 24, 2025.

104. Despite the disclosure, the price of Fiserv stock remained artificially inflated as the Individual Defendants continued to mislead investors, failing to disclose that the spread was largely attributable to the loss of transaction volumes from merchant attrition. For instance, during the 1Q25 Earnings Call, Defendant Lyons stated:

> Let's shift to our performance at the segment level. Merchant Solutions posted 8% organic revenue growth with a 10 basis point rise in adjusted operating margin to 34.2%. Bob will discuss the details, so I'd like to highlight our progress in the quarter on three key near-term initiatives.

> First is *driving Clover growth through new products, new markets, new partners and new geographies*. Second is signing more financial institutions as merchant referral partners. And the third is adding new and existing enterprise merchant clients to our Commerce Hub platform and driving VAS penetration.

105. Also during the 1Q25 Earnings Call, Defendant Hau stated:

> For Clover, revenue grew 27% in the first quarter and annualized payment volume growth of 8%. *The softer volume growth largely reflects three factors: first, leap year and Easter, as I just mentioned. Second, a difficult comparison against the gateway conversion that brought new merchants to Clover in Q1 2024. And third, a slowdown in spending in Canada, particularly on travel.* Canada is currently the largest international market for Clover. Excluding these specific factors, Clover volume grew at a healthy double-digit pace.

> Clover revenue growth was a solid 27% against the highest growth quarter last year. *There are several reasons for the spread between revenue and volume growth including a two-point gain sequentially in the penetration rate of Clover value-*

35

***added services to 24%. Roughly one-third of the spread came from strong Clover hardware sales***. As Mike mentioned, banks in particular added Clover hardware as part of a strategic focus to address the SMB acquiring market. Such sales bode well for our Processing and VAS revenue going forward.

Another nearly one-third came from growth in anticipation and Clover capital. As we added more Clover merchants in Argentina late last year, their anticipation revenue is now ramping in Clover VAS, and we continue to see overall strength in other Clover VASS as well.

106.    The following day, Fiserv filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2025 (the "1Q25 10-Q") which incorporated by reference the materially misleading risk disclosures that were contained in the 2024 10-K.

107.    On May 6, 2025, Defendant Bisignano resigned as CEO and Chairman of the Board.

108.    On May 15, 2025, during the J.P. Morgan Global Technology, Media and Communications Conference, Fiserv reported that Clover's GPV growth deceleration would persist throughout 2025. During the conference, the following exchange occurred between Defendant Hau and an analyst from J.P. Morgan:

**TienTsin Huang – J.P. Morgan – Analyst**
But I figured we just start, just given the hard stock reaction to the first quarter, give you an opportunity to address that. What might be understood. What's been the learning from that in terms of the questions you've been receiving?

**Defendant Hau**
So, maybe obvious, but I'll state the obvious, certainly disappointed with the reaction, unexpected. And what we have learned through this is ***there is an intense focus on Clover volume***. So over and over and over again, as we've talked to investors since that earnings call, it comes back to what's going on with Clover volume. They get the revenue, they get the rest of the company, but what's happening there. And so lots of conversations about kind of all the puts and takes in that number. And specifically, as I suspect most of you know, ***we reported an 8% Clover volume growth, which was slower than what we reported last year. Lots of conversation about the sequential move of that***. Fourth quarter of last year, we reported 14%. And so, when you look at it, sequentially, it looks like a 6-point drop.

36

And there were a couple of things that we talked about on the earnings call and extensively since, and two very specific things. One is last year, particularly in the first quarter of last year, we had a gateway conversion. So we had a gateway that was non-Clover clients that we converted over to the Clover Gateway. And so *we saw a pickup of volume from that last year that doesn't repeat this year*. And so that was about 2 points of headwind against the growth rate. So 8% kind of becomes 10%.

The other item we talked about is, obviously, Q1 last year, we had leap year, 1 day out of 91 days last year, 90 days this year. It's a little more than 1 point of growth. So 8% becomes 10% becomes 11%. And then we had a couple of other items we talked about, the timing of Easter was Q1 of last year, Q2 of this year, March to April. We did see some slowing of Canada, which is our largest international market in the first quarter.

Fast forward to today, right now, and I don't give quarterly guidance period, let alone on one key performance indicator around Clover. But *given the lots of discussion and questions around it, we expect second quarter to be generally similar to first quarter in terms of the reported growth rate from a volume standpoint. We do see that gateway headwind actually increasing a bit in the second quarter*.

\*　　\*　　\*

And that's a dynamic of during the first quarter, we've been converting that gateway for about a year. It's probably about two quarters heading into first quarter, got a big chunk in the first quarter and then a little bit more in second and third quarter, but *it was ramping through the first quarter. So Q2 is when you have the full quarter impact of what was going on in Q1. And then we expect that to subside going forward, Q2 – excuse me, Q3 and Q4*.

109.    Analysts reacted negatively to the disclosure, with analysts from Goldman Sachs

reporting:

The bottom line of this note, however, is that we believe *the main driver of the decel in Clover was a gateway conversion in the prior year that saw very significant churn subsequent to the conversion*. Thus, Fiserv is currently growing over the volume from the prior year *that churned in the second half*.

\*　　\*　　\*

Fiserv migrated volumes from another platform (i.e. a back book conversion) to Clover in the first half of 2024, which the company noted was roughly a 2 point headwind to 1Q25 volumes, and mgmt noted is likely to be a slightly larger impact to volumes in 2Q25. Our understanding from our research and from speaking with

37

the company is that **these volumes were primarily e-comm merchants with limited use case for a POS platform like Clover, and thus the company experienced significant churn following the migration of these customers, as they migrated to other payment gateways that are native to their e-commerce storefronts**.

We note several anecdotal examples in various online payment forums that highlight operational issues with the migration, beginning in late 2023 and into 2024, and that are consistent with our understanding of the post migration churn dynamics. Note that we highlighted this churn dynamic in our note earlier this week after attending a Fiserv mgmt dinner. **We believe that overlap of the Payeezy gateway with various website builder platforms such as Shopify and WooCommerce made it particularly easy to migrate to native payment offerings after experiencing frictions with the migration**. The bottom line here is we believe that this explains why FI is saying that the headwinds from the gateway conversion will abate in 2H25, because the migrated volumes experienced very high churn and did not contribute as much in 2H24.

110.    Analysts from Wolfe Research stated the following with respect to Clover's attrition rate:

> **The primary drag on Clover's growth in Q1 and Q2 has been the migration of Payeezy gateway merchants onto Clover throughout FY24**. While this initiative boosted volumes in the 1H'24, it was partially offset by higher attrition in the second half. Q1 2025 Clover volume growth decelerated by roughly 200bps and is expected to have a ~300bps impact in Q2, as the Y/Y benefit laps (the migration process peaked with the discontinuation of Payeezy onboarding on March 25, 2024), coupled with attrition of the Payeezy conversion base.
>
> Management noted that attrition from these migrated merchants **began relatively quickly, driven largely by price-sensitive clients seeking lower-cost alternatives (as these merchants weren't typically utilizing FI's VAS offerings)**. This attrition partially offset some volume growth in Q3 and Q4 2024, but sets up easier Y/Y comparisons in the back half of 2025.

111.    On this news, the price of Fiserv stock declined 16.2%, from a close of $189.86 per share on May 14, 2025 to a close of $159.13 per share on May 15, 2025.

112.    On May 20, 2025, Defendant Hau participated at the Barclays Emerging Payments and FinTech Forum on behalf of the Company. During the forum, Defendant Hau revealed the "significant" price and operational impact with the Payeezy platform:

I certainly recognize that the reported GPV for the first quarter and our outlook for the second quarter, 8%, was a surprise or a disappointment, but particularly if you factor in the impact of the gateway that we've talked about extensively in the last three weeks, right in line with our expectations as we entered this year, right in line with where we believe the year is going. We've talked a lot about at – gateway, low double digits in the first quarter and in the second quarter. That's our expectation to deliver that $3.5 billion, and we feel good about our ability to do that.

Just a little bit of background on that gateway, because I think there's been some misunderstanding about what that is and why we did it. This is a third-party gateway that we resold over the last several years, and we found ourselves, a couple of years ago, being a very large part of a third party from a rep standpoint, and **we started to see some significant price impact and operational impact**. So, we made the decision a couple of years ago or so, to exit that gateway and when you make that decision, you want to move all of those merchants to a new gateway. And obviously, the right choice for us is our go-forward gateway, Clover.

So, we went through that process. It wasn't about driving additional volume or revenue to Clover. It was about operational efficiency, cost savings and getting folks to the appropriate gateway. We did that. We started it late 2023, really accelerated the peak amount of movement was in first quarter of 2024. So you see that impact now as that business kind of laps itself, so to speak.

113. On June 4, 2025, Defendant Hau participated at the William Blair Growth Stock Conference on behalf of the Company. During the conference, Defendant Hau conceded that the Payeezy gateway had become "quite costly and a bit problematic":

And we've talked extensively about the gateway conversion that we did in 2024, late '23, early '24, that caused about a 2 point headwind on that 8 points. So that 8%, if you adjust for the gateway, low-double-digits, consistent with what we saw last year. And that gateway conversion really didn't bring much revenue. It was a strategy to eliminate. **One gateway that we had in the company was a third-party gateway that we were white labeling that became quite costly and a bit problematic**. And so we made the decision to move away from that gateway. And once you make that decision to leave a gateway, you've got to figure out where you're going to move those clients. Obviously, Clover is our go-forward gateway. And so we move clients to the Clover. That drove some volume last year that ebbed in the first quarter of this year. So again, if you adjust, we're at low-double-digits, right in line with what we expected and right in line with what we need to deliver the $3.5 billion for this year.

114. During the conference, Defendant Hau continued to overstate the Company's prospects:

**Andrew W. Jeffrey – William Blair – Analyst**
So, we just have a couple more minutes. Maybe if you could just offer a high-level, medium-term outlook for organic revenue growth, EBIT margin expansion, EPS growth, mentioning that should be the 40th consecutive year of double-digit EPS growth, which is no small feat.

**Defendant Hau**
Yeah.

**Andrew W. Jeffrey – William Blair – Analyst**
I guess you get credit for about a quarter of that.

**Defendant Hau**
That's right.

**Andrew W. Jeffrey – William Blair – Analyst**
And maybe capital allocation.

**Defendant Hau**
Yeah. So, we talked a little bit – *we expect the total company to grow 10% to 12% this year. This will be the fourth year in a row of 11% or better growth, if we hit the midpoint of that. So, we've been in double digits for the last several years. For the company, that's quite an acceleration.*

115.    On July 23, 2025, Fiserv reported its second quarter 2025 financial results. The Company lowered the top end of its full-year organic growth guidance range and reported a deceleration in Merchant Solutions segment revenue growth to 9% year-over-year, down from 11% in the previous quarter. During an earnings call, hosted by the Company that day, Defendant Lyons stated that, with respect to "the overall organic growth rate for the company," "[w]e obviously refined to approximately 10%, from 10% to 12%."

116.    Analysts reacted negatively to the disclosure, with some questioning the credibility of the Company's growth metrics. For example, Wolfe Research analysts reported that "we recognize a need for the dust to settle, **with stability/credibility in metrics and guidance reestablished** before some investors add materially to shares." Analysts from Keefe Bruyette & Woods reported that "FI missed Merchant segment organic growth expectations (again) and

lowered its FY25 organic growth revenue outlook to the lower end of the prior range, implying *the steep ramp in Merchant segment growth that was previously anticipated is unachievable*."

117.    On this news, the price of Fiserv stock declined 13.9% from a close of $165.98 per share on July 22, 2025 to a close of $143.00 per share on July 23, 2025. As the market digested the news over the following week, the price of Fiserv stock continued to decline, reaching $138.94 per share on July 31, 2025.

118.    Then on October 29, 2025, the Company held an earnings call, following what Defendant Lyons described as his "first full quarter as CEO." During the call, Lyons stated:

> During the third quarter, my first full quarter as CEO, I worked with a management team and several external advisers to conduct a rigorous analysis of the company's operations, technology, financials and forecasting including thousands of client and employee meetings and external benchmarking. As the new CEO, it was natural for me to push our team to think critically about our businesses and objectively assess long-term value drivers, competitive strengths and weaknesses and ultimately, how we communicate with the investment community. The analysis was integrated into our annual strategic planning process, which starts every August and continues into the fall, with ongoing communication and interaction with our Board of Directors.

119.    During the call, Defendant Lyons explained that this "rigorous analysis" led the Company to conclude that its prior 2025 guidance relied on assumptions regarding outsized business-volume growth, broad-based productivity improvements, record sales activity, and short-term revenue and expense initiatives that, even with "strong execution," would have been "objectively difficult" to achieve. Accordingly, Defendants cut EPS and revenue guidance, beyond the previously-reduced guidance from July 2025.

120.    On this news, the Company's stock price fell 44%, from a close of $126.17 per share on October 28, 2025 to $70.60 per share on October 29, 2025.

**Insider Sales**

121.    During the Relevant Period, while the Company's stock price was artificially

41

inflated and before the scheme was exposed, Defendants Bisignano, Simons, Miller, and Best sold significant portions of Company common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

122. While the Company's stock price was artificially inflated, Defendant Bisignano sold approximately 145,000 shares of Company common stock, totaling proceeds of approximately $25,718,650. Defendant Bisignano made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 09/20/2024 | 145,000 | $177.37 | $25,718,650 |

123. While the Company's stock price was artificially inflated, Defendant Simons sold approximately 40,000 shares of Company common stock, totaling proceeds of approximately $8,078,800. Defendant Simons made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 10/23/2024 | 40,000 | $201.97 | $8,078,800 |

124. While the Company's stock price was artificially inflated, Defendant Miller sold approximately 30,000 shares of Company common stock, totaling proceeds of approximately $6,033,900. Defendant Miller made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 10/30/2024 | 30,000 | $201.13 | $6,033,900 |

125. While the Company's stock price was artificially inflated, Defendant Best sold approximately 20,821 shares of Company common stock, totaling proceeds of approximately

$4,468,394. Defendant Best made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 11/12/2024 | 20,821 | $214.61 | $4,468,394 |

126.    In total, during the Relevant Period, these four Individual Defendants' lucrative insider sales netted proceeds of almost $44.3 million.

127.    As a result of these insider sales, Defendants Bisignano, Simons, Miller, and Best were unjustly enriched.

***Stock Repurchases During the Relevant Period***

128.    According to the Company's public filings, during the Relevant Period, while the price of the Company's stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 42.8 million shares of its own stock, for a total of roughly $8 billion.

129.    Specifically, the Company repurchased approximately 7.6 million shares for $1.3 billion during the third quarter of 2024, 6.1 million shares for $1.3 billion during the fourth quarter of 2024, 9.7 million shares for $2.2 billion during the first quarter of 2025, 12.2 million shares for $2.2 billion during the second quarter of 2025, and 7.2 million shares for $1.0 billion during the third quarter of 2025.

130.    Given that the price of Fiserv stock was $70.60 per share after the corrective disclosures on October 29, 2025, the true value of the 42.8 million repurchased shares was roughly $3 billion. Accordingly, the Individual Defendants caused the Company to overpay by approximately $5 billion to repurchase these shares.

## DAMAGE TO FISERV

131.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Actions.

132.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls and compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Fiserv.

133.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Fiserv has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND ALLEGATIONS

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

135.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

136.    Plaintiff will adequately and fairly represent the interests of Fiserv and its stockholders in enforcing and prosecuting its rights.

137.    Plaintiff is a current shareholder of Fiserv and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.

138.     Plaintiff has made a pre-suit demand on the Board of Fiserv. During the wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Lyons, de Castro, Cohen, DiSimone, Fritz, Gopal, Mamilli, and Yarkoni (the "Director Defendants"), as well as non-parties Nixon, Dufétel, and Shedlin.

139.     The Director Defendants either knew or should have known the facts surrounding Clover's loss of customers caused by inadequate customer service and the high cost of the platform. Each of the Director Defendants approved and/or permitted the wrongdoing alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein or failed to correct them.

140.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issues of various false and misleading statements or failed to correct them, and are principal beneficiaries of the wrongdoing alleged here.

141.     Nevertheless, by letter dated August 6, 2025, Plaintiff made a demand on the Board to investigate and remedy the violations of law described therein (the "Litigation Demand").

142.     In the Litigation Demand, Plaintiff demanded as follows:

[T]he Stockholder demands that the Board investigate the circumstances surrounding the Company's false and misleading statements and violations of all applicable laws, rules, and regulations. The Board must undertake an investigation of the wrongdoing detailed herein and in the Complaint by independent and disinterested directors with the assistance of independent outside legal counsel.

*     *     *

Following the investigation, the Stockholder demands that Fiserv commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above and in the Complaint. The legal proceedings should bring claims for breaches of fiduciary

45

duty, among other relevant and appropriate claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. The Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. To the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Fiserv from committing future wrongful and wasteful acts.

143. In light of the substantial breaches of fiduciary duties detailed herein and in the Litigation Demand, the Board's failure to initiate an investigation into the alleged wrongdoing is unreasonable and improper, demonstrates the Board's lack of good faith, and constitutes a refusal of the Litigation Demand.

144. Refusal of the Litigation Demand is not a valid exercise of business judgment and, therefore, Plaintiff is permitted to proceed and to prosecute this action derivatively on behalf of the Company.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

145. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

46

147.     The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in 2025 Proxy. As alleged above, the 2025 Proxy contained materially false and misleading statements concerning the Company's growth prospects and the adequacy of its internal controls and risk management function.

148.     The 2025 Proxy was used to solicit shareholder votes in connection with the re-election of Defendants Bisignano, Lyons, Cohen, de Castro, DiSimone, Fritz, Gopal, Mamilli, Simons, Warren, and Yarkoni to serve for another one-year term on the Company's Board. In addition, the 2025 Proxy was used to solicit the advisor vote to approve the compensation of, *inter alia*, Defendants Bisignano and Hau. While the shareholder vote was non-binding, the 2025 Proxy indicated that "the talent and compensation committee will carefully consider the outcome of the vote when considering future executive compensation decisions."

149.     Describing the Company's executive compensation program, the 2025 Proxy indicated that compensation is performance-based, stating that "a significant portion of compensation is 'at-risk'" and that the compensation program is designed "to incentivize and reward our executive officers for sustained financial, operating, and strategic performance."

150.     The materially false and misleading statements contained in the 2025 Proxy regarding the Company's growth prospects and the adequacy of its internal controls and risk management function therefore misleadingly induced shareholders to vote in favor of the election of Defendants Bisignano, Lyons, Cohen, de Castro, DiSimone, Fritz, Gopal, Mamilli, Simons, Warren, and Yarkoni and performance-based compensation to Defendants Bisignano and Hau, to which they were not entitled.

151.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

**Against the Individual Defendants for Violations of Section 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Fiserv. Not only is Fiserv now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Fiserv by the Individual Defendants.

154.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $5 billion to repurchase roughly 42.8 million shares.

155.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

156.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fiserv not misleading.

157.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and

authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Fiserv.

158.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

159.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### Against the Individual Defendants
### for Breach of Fiduciary Duties

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

162.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

163.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

49

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164.    Moreover, in further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

165.    Furthermore, four of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

166.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

167.    Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## **COUNT IV**

### **Against the Individual Defendants**
### **for Aiding and Abetting Breach of Fiduciary Duty**

168. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

170. Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## **COUNT V**

### **Against the Individual Defendants**
### **for Unjust Enrichment**

171. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Fiserv.

173. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Fiserv that were tied to the performance or artificially inflated valuation of Fiserv, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

51

174.     Moreover, as alleged herein, Individual Defendants Bisignano, Simons, Miller, and Best engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $44.3 million.

175.     Plaintiff, as a shareholder and representative of Fiserv, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

176.     Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### for Waste of Corporate Assets

177.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Fiserv to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

179.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180.     Plaintiff, on behalf of Fiserv, has no adequate remedy at law.

52

# COUNT VII

**Against Defendants Bisignano, Hau, Lyons, and Best for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

181.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.     Fiserv, along with Defendants Bisignano, Hau, Lyons, and Best (the "Officer Defendants"), are named as defendants in the S.D.N.Y. Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Defendants Hau and Lyons are also named as defendants in the E.D. Wis. Securities Class Action.

183.     The Securities Class Actions allege that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Fiserv securities. The Securities Class Actions further allege that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

184.     If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

185.     The Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which

governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)     Declaring that the Plaintiff may maintain this action on behalf of Fiserv and that Plaintiff is an adequate representative of the Company;

b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Fiserv;

c)     Determining and awarding to Fiserv the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)     Directing Fiserv to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fiserv and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

54

e)      Awarding punitive damages;

f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g)      Granting such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2026

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

**RIGRODSKY LAW, P.A.**

By: *<u>/s/ Gina M. Serra</u>*
Gina M Serra
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*